# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
Filed: December 14, 2016
No. 15-777V

\* \* \* \* \* \* \* \* \* \* \* \* \*
| | |
|---|---|
| HEATHER CARON, o/b/o and as next friend of A.C., a minor, * | |
| * | Ruling on Facts; Onset; Diphtheria- |
| * | Tetanus-acellular-Pertussis ("DTaP") |
| Petitioner, * | Vaccine; Polio and Haemophilus Influenzae |
| * | Type B ("IPV/HIB") Vaccine; Measles- |
| v. * | Mumps-Rubella ("MMR") Vaccine; |
| * | Varicella Vaccine; Chronic Recurrent |
| SECRETARY OF HEALTH * | Multifocal Osteomyelitis. |
| AND HUMAN SERVICES, * | |
| * | |
| Respondent. * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## RULING ON ONSET[1]

**Roth, Special Master:**

On July 23, 2015, Heather Caron ("Ms. Caron" or "petitioner") filed a petition on behalf of her minor child, A.C., pursuant to the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] ("Vaccine Act" or "the Program"). Petitioner alleges that the diphtheria-tetanus-acellular pertussis ("DTaP"), polio and haemophilus influenzae type B ("IPV/HIB"), measles-mumps-rubella ("MMR"), and varicella vaccinations that A.C. received on

---

[1] Because this unpublished ruling contains a reasoned explanation for the action in this case, I intend to post this decision on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002, Pub. L. No. 107-347, § 205, 116 Stat. 2899, 2913 (codified as amended at 44 U.S.C. § 3501 note (2006)).  In accordance with Vaccine Rule 18(b), a party has 14 days to identify and move to delete medical or other information that satisfies the criteria in § 300aa-12(d)(4)(B).  Further, consistent with the rule requirement, a motion for redaction must include a proposed redacted decision.  If, upon review, I agree that the identified material fits within the requirements of that provision, I will delete such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755 (1986).  Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

1

August 2, 2012 caused him to suffer from chronic recurrent multifocal osteomyelitis ("CRMO")[3] as well as chronic episodes of acute otitis media, fever, coughing, leg pain, neck pain, and joint pain, and related symptoms and associated symptoms and deficits. Petition, ECF No. 1, at 1-2.

Respondent states that the medical records in this matter do not show complaints consistent with CRMO until January 2013. Ms. Caron concedes that her assertion that A.C.'s symptoms started in the fall of 2012 is in conflict with the contemporaneous medical records. However, petitioner argues that the multiple affidavits submitted in support of a fall 2012 onset are "overwhelmingly more persuasive than the medical records regarding the onset of A.C.'s symptoms." Petitioner's Brief ("Pet. Onset Brief") at 4.

In order to resolve the discrepancies between A.C.'s medical records and the accounts of petitioner and several witnesses, I held a fact hearing to determine the timing of onset of A.C.'s symptoms of CRMO. The hearing was conducted on July 11, 2016. Only Ms. Caron testified. *See* Transcript ("Tr."), 4-34.[4] Thus, the entirety of the evidence submitted by petitioner in favor of an onset date in the fall of 2012 is comprised of the testimony and affidavits of Ms. Caron, a date book kept by Ms. Caron (partially constructed almost two years after the events, *see* Tr. 10.2 to 10.12), and affidavits submitted by several family members and friends.

This fact ruling is intended to clarify the onset of A.C.'s symptoms of CRMO and **must be given to each expert witness. In writing their reports, the experts must rely on the factual findings contained in this Ruling.**

Having carefully considered the medical records, affidavits, and testimony, I find that the contemporaneous medical records and histories provided by petitioner to her child's medical providers at the time of the events more accurately reflect the onset of A.C.'s CRMO. Specific factual findings are set forth in detail below. In summary, I find that A.C. did not begin displaying symptoms of CRMO until January 2013, approximately five months after he received the allegedly causal vaccinations.

---

[3] Chronic recurrent multifocal osteomyelitis ("CRMO") is an inflammatory bone condition which includes recurrent episodes of pain and joint swelling with or without fever. The most commonly affected areas are the knees, ankles, and wrists. Symptoms typically begin in childhood. For most children, CRMO resolves after many years without lasting effects. The trend in research suggests that CRMO is an autoimmune genetic condition. *See* "Chronic Recurrent Multifocal Osteomyelitis (CRMO)," About Kids Health, THE HOSPITAL FOR SICK CHILDREN, http://www.aboutkidshealth.ca/En/HealthAZ/ConditionsandDiseases/InflammatoryConditions/Pages/Chronic-Recurrent-Multifocal-Osteomyelitis-CRMO.aspx (last visited Nov. 4, 2016).

[4] Mr. Caron accompanied his wife to the hearing and sat through her testimony, but did not offer any testimony in this matter. He likewise did not submit an affidavit.

## I. Procedural History

Ms. Caron filed her Petition on July 23, 2015. It was accompanied by her first affidavit ("First Aff. of Heather Caron").[5] This case was originally assigned to Special Master Hamilton-Fieldman,[6] who ordered petitioner to file medical records and a Statement of Completion by September 3, 2015. *See* Initial Order, issued Jul. 24, 2015, ECF No. 5. The next day, petitioner filed 12 exhibits, all of which were medical records. *See* ECF No. 6. A Statement of Completion was filed on September 3, 2015. ECF No. 9.

On September 28, 2015, respondent filed a status report indicating that the records appeared to be complete and highlighting what she described as "significant weaknesses in petitioner's claim, most notably the alleged onset of A.C.'s alleged vaccine-injury." Respondent's Status Report ("Resp. Stat. Rep."), filed Sept. 28, 2015, ECF No. 10, at 1.

Special Master Hamilton-Fieldman held the initial status conference on October 19, 2015. During the conference, she noted "that there is insufficient evidence in the record to support [p]etitioner's allegation that onset occurred in the fall of 2012" and that A.C.'s physicians documented the onset of his symptoms to be January 2013. Order, issued Oct. 20, 2016, ECF No. 11, at 1. Special Master Hamilton-Fieldman ordered petitioner to file additional documentation supporting the earlier onset date and a status report indicating how she wished to proceed with resolving the timing discrepancy. *Id.*

On November 16, 2015, petitioner filed several pages of a 2012 calendar[7] (referred to as a "date book"). The date book dedicates two pages to each month and includes petitioner's handwritten notes. Petitioner also filed her second affidavit as well as affidavits from Theresa Joseph and Irvin Joseph. *See* Notice of Filing, Nov. 16, 2015, ECF No. 12. Three weeks later, petitioner filed affidavits from Jennifer Rowe and Jeremy Gordon. *See* Notice of Filing, Dec. 8, 2015, ECF No. 15.

Another status conference was held on December 23, 2015. Special Master Hamilton-Fieldman remarked that the affidavits and date book contradicted A.C.'s medical records, and ordered petitioner to file a brief regarding the timing of onset. Order, issued Dec. 28, 2015, ECF No. 16.

On January 7, 2016, petitioner filed her brief regarding onset of symptoms ("Pet. Onset Brief"), ECF No. 17.[8] Petitioner's counsel argued that the multiple affidavits describing A.C.'s onset of symptoms in the fall of 2012 were more persuasive than the medical records, which

---

[5] Petitioner's counsel did not file affidavits as exhibits. Rather than re-designate them, in order to minimize confusion I will refer to all affidavits simply as "Affidavit of [Person]."

[6] This case was assigned to me on January 14, 2016. ECF No. 18.

[7] The date book appears to start in March of 2012, though the top of the first two-page spread is cut off. The date book ends in December of 2012.

[8] Petitioner's brief was incorrectly docketed as a memorandum.

uniformly date the onset as January 2013. Petitioner requested an evidentiary hearing. Pet. Onset Brief at 4.

Respondent filed her brief on January 28, 2016 ("Resp. Onset Brief"), ECF No. 20. Respondent argued that a determination of onset of symptoms as described in the affidavits would "be contrary to all of the medical records that otherwise reveal petitioner to be a very observant parent, with an appropriate level of vigilance, who did not hesitate to take her son to see the doctor for minor health issues." Resp. Onset Brief at 6. Respondent also noted that the affidavits filed by petitioner's family and friends state that none of them has an independent recollection of the events, but bases their affidavits on Ms. Caron's date book. *Id.*

This case was reassigned to me on January 14, 2016. ECF No. 18. I held a status conference on February 17, 2016, to discuss potential hearing dates. After the parties provided their availability, an onset hearing was scheduled for July 11, 2016. *See* Prehearing Order, issued March 29, 2016, ECF No. 26, *amended* May 13, 2016, ECF No. 27. Petitioner filed a supplemental affidavit from Ms. Caron on June 21, 2016. ECF No. 28.

The hearing was held on July 11, 2016. Respondent's counsel appeared in person. Petitioner and her counsel appeared via video link from Maine. On August 10, 2016, petitioner filed her 2013 date book in accordance with my post-hearing Order. ECF No. 34. This matter is now ripe for a ruling on the onset of A.C.'s CRMO symptoms.

## II. Legal Standards Regarding Fact Finding

Petitioners bear the burden of establishing their claims by a preponderance of the evidence. § 13(a)(1). A petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he or she] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

The process for making determinations in Vaccine Program cases regarding factual issues, such as the timing of onset of petitioner's alleged injury, begins with analyzing the medical records, which are required to be filed with the petition. 42 U.S.C. § 300aa-11(c)(2). Medical records created contemporaneously with the events they describe are presumed to be accurate and "complete" (i.e., presenting all relevant information on a patient's health problems). *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *Doe/70 v. Sec'y of Health & Human Servs.,* 95 Fed. Cl. 598, 608 (2010)("[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"). This presumption is based on the linked proposition that (i) sick people visit medical professionals; (ii) sick people honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in an accurate manner, so that they are aware of enough relevant facts to make appropriate treatment decisions. *Sanchez v. Sec'y of Health & Human Servs.*, No. 11-685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013); *Cucuras v. Sec'y of Health & Human Servs.,* 26 Cl. Ct. 537, 543 (1992), *aff'd,* 993 F. 2d. 1525 (Fed. Cir. 1993)("[i]t strains reason to conclude that petitioners would fail to accurately

report the onset of their daughter's symptoms. It is equally unlikely that pediatric neurologists, who are trained in taking medical histories concerning the onset of neurologically significant symptoms, would consistently but erroneously report the onset of seizures a week after they in fact occurred").

Where medical records are clear, consistent and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.,* No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). Indeed, contemporaneous medical records are generally found to be deserving of greater evidentiary weight than oral testimony—especially where such testimony conflicts with the record evidence. *Cucuras*, 993 F. 2d at 1528; *see also Murphy v. Sec'y of Health and Human Servs.,* 23 Cl. Ct. 726, 733 (1991), *aff'd*, 968 F. 2d 1226 (Fed. Cir.) (citing *United States v. United States Gypsum Co.,* 333 U.S. 364, 396 (1947)("[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight")). In making contemporaneous reports, the declarant's motivation for accurate explication of symptoms is more immediate, as opposed to testimony offered after the events in question, which is considered inherently less reliable. *Reusser v. Sec'y of Health & Human Servs.*, 28 Fed. Cl. 516, 523 (1993).

However, there are situations in which compelling oral testimony may be more persuasive than written records—for instance in cases where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health &Human Servs.*, 69 Fed. Cl. 775, 779 (2006)("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."); *Lowrie,* 2005 WL. 6117475, at *19 ("[w]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent")(quoting *Murphy v. Sec'y of Health & Human Servs.,* 23 Cl. Ct. 726, 733 (1991), *aff'd per curium,* 968 F. 2d 1226 (Fed. Cir. 1992)). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be afforded. *Andreu v. Sec'y of Health & Human Servs.*, 569 F. 3d. 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.,* 991 F. 2d. 1570, 1575 (Fed. Cir. 1993).

When witness testimony is used to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent and compelling." *Sanchez,* 2013 WL 1880825, at *3 (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90-2808V, 1998 WL 408611, at *85 (Fed. Cl. Spec. Mstr. June 30, 1998)). In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed Cl. 184, 203-204 (2013), *aff'd,* 746 F. 3d. 1334 (Fed. Cir. 2014). In making a determination regarding whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at hearing, there must be evidence that this decision was the result of a rational determination. *Burns by Burns v. Sec'y of Health & Human Servs.,* 3 F. 3d 415, 417 (Fed. Cir. 1993).

Despite the weight afforded medical records, special masters are not bound rigidly by those records in determining onset of a petitioner's symptoms. *Villenzuela v. Sec'y of Health & Human Servs.,* No. 90-1002V, 1991 WL 182241, at *3 (Fed. Cl. Spec. Mstr. Aug. 30, 1991); *see also Eng v. Sec'y of Health & Human Servs.,* No. 90-175V, 1994 WL 67704, at *3 (Fed. Cl. Spec. Mstr. Feb 18, 1994) (explaining that §13(b)(2) "must be construed so as to give effect to §13(b)(1) which directs the special master or court to consider the medical records (reports, diagnosis, conclusions, medical judgment, test reports, etc.) but does not require the special master or court to be bound by them").

### III. The Factual Record

**A. Medical History**

A.C. was born on July 18, 2009. The pediatric records indicate that he was born four weeks prematurely, but no prenatal or birth records were filed. A.C. had his first pediatric visit on July 29, 2009, at which time he was noted to be under the care of his aunt and receiving expressed milk due to Ms. Caron having an infection and being hospitalized. He had a history of "weight loss, abnormal" which had improved; he was "ding (sic) well, back to bw." Pet. Ex 1 at 3-4.

Between July 29, 2009 and August 2, 2012, when he received the allegedly causal vaccines, A.C. was seen in the pediatrician's office approximately 43 times for a variety of complaints, including congestion, cough, wheezing, ear infections, vomiting, and insect bites, as well as well child visits. At his well child visits, routine vaccines were administered without event on a modified schedule at the parents' request. *See generally,* Pet. Exs. 1 and 2.

A.C. was also presented to the hospital on multiple occasions. He was admitted to Maine General Hospital on October 2, 2009 for acute otitis media and upper respiratory infection/pneumonia. Pet. Ex. 1 at 18-21. On November 29, 2009, he was brought to the emergency room at Maine General Hospital for an upper respiratory infection. *Id.* at 34-37. A sweat test was performed at the request of his parents due to concerns that he was constantly sick. The results were normal. *Id.* at 43-50.

On October 18, 2010, he was presented to the emergency room with an ear infection. Pet. Ex. 1 at 92. On September 20, 2011, he was taken to the emergency room for a small cut on his head. *Id.* at 106-107. On November 8, 2011 he was brought to the emergency room for cough and congestion that had lasted for four weeks. At that visit, Ms. Caron stated that since she had been unable to see their primary care physician, she presented A.C. to the ER for evaluation. The record for the visit states "[Ms. Caron] is just concerned because he has had a persistent cough and nasal discharge. The child himself does not have any complaints. He is quite active as I enter the room. He is up and down off the stretcher and playing with his coloring book and stickers." *Id.* at 108.

In January 2012, A.C.'s care was transferred to a different pediatric practice. On January 31, 2012, A.C. presented to the pediatrician with "pale stool x past month, today was white—had photograph on phone, started after a course of diarrhea that resolved…occasional complaints of

6

abdominal pain, 'booboo', has speech delay…current cold, rhinorrhea, congestion, wet cough, pulling on ears, fever." Pet. Ex. 2 at 126-128.

On February 3, 2012, A.C. presented to the pediatrician for a follow up visit. He was "complaining more about abdominal pain 'booboo' in past few days not eating well for 2 weeks, but variable intake whitish-pale stool since 12/25…first cousin had a tumor in intestine that ruptured per parent report, parents are very concerned LFT has slight elevation of AST but otherwise normal. Well appearing child, appropriate for age, no acute distress…no rashes…LFTs reassuring. Stool studies with negative blood and leukocytes. Fecal fat pending. Parents very concerned given recent complaints of pain and duration of pale stools. Will refer to pedi GI." Pet. Ex. 2 at 129-130. No records from a pediatric gastroenterologist were filed.

On April 26, 2012, A.C. returned to the pediatrician with cold symptoms and a fever. He was diagnosed with an upper respiratory infection. *Id.* at 138-139.

On July 11, 2012, A.C. returned to the pediatrician for "croup" and "reactive airway disease." *Id.* at 140-142. Approximately two weeks later, on July 29, 2012, Ms. Caron brought A.C. back to the pediatrician because he had multiple bug bites. The consultation notes reflect that "[M]om outlined several because he seems to have some big reactions to them." *Id.* at 143.

On August 2, 2012, A.C. visited the pediatrician for a well child exam. He was noted to be a well child on a gluten free diet. He was meeting all milestones but his speech was only about 50% intelligible. He was being home schooled and needed to catch up on his vaccinations. A.C. received the allegedly causal DTaP, IPV/HIB, MMR and Varicella vaccines at that visit. *Id.* at 162, 168-171.

Following the August 2, 2012 visit, A.C. did not return to a medical care provider until December 4, 2012, when he presented for complaints that his right ear had been "closing" for the past few days. He was noted to be afebrile and a well-appearing child in no acute distress. He was diagnosed with ear wax of the right ear. No other complaints were noted. *Id.* at 145-146.

On January 16, 2013, A.C. presented to the pediatrician with foot pain. The medical record on that date notes that Ms. Caron was concerned about A.C.'s right foot or ankle. A.C. "seems to be favoring it, c/o pain and when sitting /lying down keeps it flexed up, walking on it abnormally. No known injury, no bruising, no redness, no swelling. Since last Thursday, about a week now, have tried ice, no other meds." *Id.* at 172. Upon examination, the pediatrician noted a "right foot in flexed position, toes up; walking mostly on medial edge of foot will relax when asked but then flexes again, relaxed when sitting on feet however, FROM [full range of motion], no pain with movement, when distracted no tenderness but when asked points to top of foot that hurts. No edema, no erythema, no ecchymosis." *Id.* A.C.'s foot was wrapped in an ace bandage and Ms. Caron was told to follow up as needed. *Id.* at 173.

On January 19, 2013, Ms. Caron presented A.C. to Mid-Coast Hospital with "20 hours of fever up to 105, has complained of nausea but no vomiting." Pet. Ex. 7, p. 292. Ms. Caron stated that he complained of head pain and had significantly decreased appetite and activity levels. A.C.'s temperature was recorded at 101.8 degrees, and he was noted to be "alert, happy, smiling,

7

interactive and playful, consolable, well hydrated, patient appears to be pain free." *Id.* at 293. Examination of A.C.'s back, upper extremities, and lower extremities was noted to be normal. A neurological examination was normal, with no focal or motor deficits. A.C. moved his extremities equally and had a normal gait. No cause was determined for his fever. *Id.* at 292-294.

On February 8, 2013, A.C. was examined by the pediatrician for fever, cough, congestion, and a runny nose that lasted five days. Both Ms. Caron and A.C.'s sister had upper respiratory infections, but no fever. A.C.'s fever had reached 103 degrees. The pediatrician noted that A.C. was a "well appearing child, appropriate for age, no acute distress." He was diagnosed with viral syndrome and questionable influenza. Ms. Caron was advised to give A.C. nonsteroidal anti-inflammatory drugs ("NSAIDs"), fluids, and rest. Tamiflu was prescribed. Pet. Ex. 2 at 147-148.

One month later, on March 1, 2013, A.C. was seen again at the pediatrician's office with complaints of stomach pain. "Mom reports A.C. c/o belly pain for over an hour, had episode increased pain, crying, around 4 pm; so made appt now improved, acting like self." A.C. was noted to be a well appearing child, appropriate for his age and in no acute distress. He was "active in hall and in room, appears comfortable, interactive with exam." A.C.'s abdominal pain appeared to have resolved. *Id.* at 149-150.

Ten days later, on March 11, 2013, A.C. returned to the pediatrician with complaints of pain in his right foot that had lasted for six days. He also had right knee discomfort, which Ms. Caron told the pediatrician "may be due to his abnl gait due to the foot. Walking in an unusual way." A.C.'s "[f]oot is held pointing out. 1 month ago had R foot pain—lasted 3 days then resolved without treatment. X-ray at that time was negative. No swelling or redness. No fever. No rash. … PE – R leg and foot with normal exam. No discomfort when moving any area of the leg when he is not bearing wt. but when trying to walk he points the toes of the R foot out and drags the foot along. He point [sic] to the medial part of the foot when asked what hurts while he is walking. L knee with normal exam." *Id.* at 173-174.

Five days later, A.C. was examined by an orthopedic specialist at Mid-Coast Medical Group Orthopedic. A.C. was noted to be a three year old with over two weeks of right foot pain and abnormal gait with no history of trauma. A.C.'s foot pain had begun to awaken him at night. He had been tested for Lyme disease and inflammatory arthritis, but both tests were negative. Recent x-rays were also normal. The orthopedic specialist believed that A.C. had a "little growth plate fracture, most likely of his distal fibula." He also noted that the limp may be more habit than pathologic. A.C. was encouraged to be full weight bearing, walk with his foot straight ahead and use a more normal gait. Pet. Ex. 2, p. 122.

On March 23, 2013, A.C. returned to the pediatrician with "fever and neck pain." Ms. Caron stated that in the prior two weeks, A.C. had begun to complain of pain in his neck when turning his head. He had a fever of 101 degrees the previous night that had since resolved. He had been sleeping more over the past several days. He had not been given Tylenol or ibuprofen for the last two days. He had a runny nose and cough. His foot pain was still present but not as severe as it had been. Upon examination, A.C. was noted to be a "[w]ell appearing child, appropriate for age, no acute distress happy playful…shotty ant cervical nodes. C/o pain in a circle around his neck with all movement…No cyanosis or deformity noted with normal ROM in all

joints still with limp but not as pronounced…Arthralgia…I'm concerned about the recurrent joint pain that he has been having. Will check labs and plan to refer to rheum." *Id.* at 184-185.

On March 26, 2013, A.C. returned to the orthopedist for follow up. He was still walking in external rotation and had been complaining of pain in multiple joints, including his shoulders. He reportedly had a very stiff neck the previous week which had not resolved. Ms. Caron advised that A.C. complained of pain, sat on the couch, and then put himself to sleep. Upon examination, he was noted to have decreased motion of the cervical spine. He had full ankle and subtaler motion and was non-tender. It was recommended that A.C. see a rheumatologist. Pet. Ex. 2, p. 123.

On April 2, 2013, A.C. was presented to Rheumatology Associates. He was noted to be a three and half year old with joint pain. His parents provided the following history: A.C. was fine until January, when he started complaining about pain in the right foot and ankle and began to limp. There was no obvious injury or illness, and his x-rays were normal. His symptoms persisted into February. He had some warmth and redness on the dorsal aspect of the right midfoot, but there was no obvious swelling. Treatment mostly consisted of ibuprofen and Tylenol. He experienced prolonged stiffness following inactivity, and was very stiff in the morning. His level of activity had diminished considerably—he walked with a limp and was unable to run. In recent weeks, A.C. had sporadic low grade temperatures of around 100 degrees. In the past month, he had begun complaining of neck pain which had been consistent since that time. He also complained of occasional right knee and right hand pain. Laboratory tests were noted to be mostly negative, but for a mildly elevated inflammatory marker. Pet. Ex. 4, p. 233.

The next day, April 3, 2013, Ms. Caron brought A.C. to Mid-Coast Hospital stating that he had fevers of up to 101 degrees every day for the past two weeks. Ms. Caron reportedly told the physicians that the rheumatologist had told her that fevers of up to 101 degrees could be a symptom of rheumatoid arthritis ("RA"). She said that A.C.'s temperature reached 103.7 that day. The medical record states that A.C. was "[f]eeling better and walking in hallway, ready for discharge." Pet. Ex. 7, p. 295. "Per mother, patient has been having generalized pain for the last month with a ? diagnosis of RA. Mother states child continued to cry due to pain so here now for evaluation. After arrival, patient states is better until he moves around and then complains again of pain 'all over' especially knees, ankles, legs and neck." *Id.* at 295. The medical record states that A.C. experienced a "gradual onset of symptoms, [d]ate and time of onset was for a while especially over the last month, [s]ymptoms are worsening." *Id.* at 296. A physical examination revealed that A.C.'s back and ranges of motion in his upper and lower extremities were all normal, but that he was tender at the knees and ankles. *Id.* at 297. A.C. was discharged with a diagnosis of Rheumatoid Arthritis and fever of uncertain cause. *Id.* at 298

One day later, on April 4, 2013, A.C. was hospitalized at Barbara Bush Hospital for headache, polyarthralgia, fever, and weight loss. Upon presentation, it was noted that "[t]hese symptoms had been present for several months but had worsened in the past few week [sic] to the point where he could not stand. Labs were remarkable for anemia (Hb 9.8) elevated inflammatory markers (CRP 14, ESR 40) and elevated alkaline phosphatase 1524." Pet. Ex. 3, p. 223. Extensive testing was performed. A lumbar puncture demonstrated normal cerebrospinal fluid ("CSF"). *Id.*

at 224.  A.C.'s discharge diagnosis was polyostotic fibrous dysplasia[9] and hypophosphatemia.[10] *Id.* at 223-228.

Dr. Daniel Hale at Barbara Bush Hospital summarized A.C.'s ailments as follows: "The patient is a 3 y.o. male without a significant past medical history who presents with fever and joint pain.  Mom reports that in January, he had right foot pain with limping.  Seen by PCP and x-ray looked fine.  Treated with an ace bandage.  Symptoms resolved within 1 week.  Then in March, he complained of BL foot pain and left knee pain.  Seen by ortho.  More x rays no fracture. PCP referred to rheumatology.  Last 5 week [sic], his pain has progressively worsened and he was staying up at night crying.  Now, he is complaining of R butt or hip pain, R knee, feet, hand pain.  Not wanting to pick up things with hands.  No swelling or redness of joints.  They feel warm to mom.  Fever for the past 2 weeks, 99-101 almost every day.  Worse at night.  Past 3 days, his fever has been getting higher up to 103.  Last night, mom took him to Midcoast ED for fever and neck pain.  Not extending his head to look up.  Decreased ROM turning head.  Not wanting to bear weight unless given pain medications.  Pain is improved with Tylenol with codeine.  Mom tried giving him Motrin and Tylenol."  Pet. Ex. 12, p. 398-399.

The pediatric hematologist at Barbara Bush Hospital obtained a similar history from Ms. Caron.  "In January of 2013 c/o intermittent pain in foot.  Pain self resolved.  Pain reoccurred and seen by orthopedics.  Per report plain films obtained and WNL.  Initially low grade fevers but over the last 2-3 weeks increase fever.  Now refusing to walk secondary to pain.  Unable to flex neck secondary to pain."  Pet. Ex. 12, p. 409.

The pediatric infectious disease consult at Barbara Bush Hospital noted that "[t]he history was obtained from mother.  [A.C.] is a 3 y.o. male who presented yesterday with 3-4 months of joint pain and intermittent fevers.  [A.C.] was in his typical state of health until mid January when he began to have pain of his right foot and ankle…one month later in mid February, [A.C.] again began to have pain of the same foot, with some redness and swelling of the dorsum of that foot.  He also began to complain of neck pain… and in early April was referred to rheumatology due to continued foot and neck pain.  He also began to complain of pain in his left knee."  Pet. Ex. 12, p. 414.

In the months that followed, "bone biopsies were reviewed at multiple institutions and the consensus has been consistent with Chronic Recurrent Multifocal Osteomyelitis."  Pet. Ex. 4 at 236.

---

[9] Polyostotic fibrous dysplasia is a "non inherited developmental anomaly of bone in which normal bone marrow is replaced by fibro-osseous tissues."  The disease may be localized to a single bone (monostotic) or multiple bones (polyostotic).  Medscape, "Fibrous Dysplasia Pathology," last updated Jan. 5, 2015, http://emedicine.medscape.com/article/1998464-overview (last visited Nov. 29, 2016).

[10] Hypophosphatemia is a serum phosphate level of less than 2.5 mg/dL.  Phosphate is necessary for many cellular processes.  It is also one of the major components of the skeleton.  Medscape, "Hypophosphatemia," last updated Jul. 26, 2016, http://emedicine.medscape.com/article/242280-overview (last visited Dec. 2, 2016).

The most recent medical record filed for A.C. is a June 1, 2015 visit with his rheumatologist, who noted that A.C.'s CRMO was in remission, though he continued have stiffness in the morning and complaints of left knee pain. An MRI of the left knee did not show any osteomyelitis but did show a bony abnormality. A.C. walked with an abnormal gait favoring the left leg. His bone scans did not suggest any osteomyelitis, which the rheumatologist found to be reassuring. A.C. was referred back to an orthopedic specialist. Pet. Ex. 4 at 253-254.

**B. Affidavits**

      i. Affidavits of Ms. Caron

On November 16, 2015, Ms. Caron submitted an affidavit stating that "soon after the vaccinations, A.C. began to experience pain and related symptoms in his foot and ankle, but my husband and I did not immediately seek medical attention because the symptoms did not appear to be significant." First Affidavit of Heather Caron at 1.[11]

Ms. Caron affirmed that friends and family had observed A.C.'s symptoms. Patricia Bailey[12] told Ms. Caron that she found A.C. to be quiet, distant and not interacting with the other children on August 19, 2012. Dixy Love-O'Neill[13] told her that she recalled A.C. complaining about pain in his feet, asking to be carried to see her horses, and being fatigued on October 15, 2012. Jennifer Rowe and Jeremy Gordon,[14] who had A.C. overnight from September 22 to 23, 2012, informed Ms. Caron that they both recalled A.C. complaining about pain in his foot for much of the night. Irvin and Theresa Joseph[15] told Ms. Caron that on November 17 and 18, 2012, Mr. Joseph noticed A.C. walking with an abnormal gait and heard him complain of pain in his feet. Ms. Joseph recalled that A.C. told her about the "boo boos" in his feet. Both of the Josephs stated that A.C. was fatigued and took frequent naps. While visiting the Josephs in December of 2012, A.C. was running a consistent low-grade fever. *See generally id.* at 2-3.

On June 21, 2016, Ms. Caron submitted a second affidavit. The only difference between this affidavit and the one submitted previously was the final paragraph, which included the following sentence: "The reason that we did not seek medical evaluation for several months was due to a disagreement between me and my husband as to whether evaluation was necessary." Second Affidavit of Heather Caron at 3.[16]

---

[11] Heather Caron's affidavit is located at ECF No. 12.

[12] Ms. Bailey is a friend from the Carons' church. Tr. 11.19 to 11.22.

[13] Ms. Love-O'Neill is a friend from the Carons' church. Tr. 16.5 to 16.11.

[14] Ms. Rowe and Mr. Gordon are Ms. Caron's aunt and uncle. Tr. 13.11 to 13.13.

[15] The Josephs are Mr. Caron's mother and stepfather, making them Ms. Caron's in-laws and A.C.'s grandparents. Tr. 17.11 to 17.17.

[16] Ms. Caron's second affidavit can be found at ECF No. 28.

Petitioner filed affidavits from each of the individuals she mentioned in her affidavits, except for Ms. Love-O'Neill. Each of these individuals based their recall of the events on a "date book" provided to them by Ms. Caron. At the Hearing, Ms. Caron confirmed that she went back to her date book almost two years later and added the details upon which the affiants relied in drafting their Affidavits. Tr. 10.2 to 10.9. None of these individuals testified at Hearing.

ii. Affidavit of Theresa Joseph

On November 16, 2015, Theresa Joseph submitted an affidavit. She stated that while visiting the Carons on November 17 and 18, 2012, A.C. told her that he had "boo boos" on his feet. Ms. Joseph recalled A.C. being extremely fatigued and taking frequent naps. Ms. Joseph stated that the Caron family visited her between December 26 and 29, 2012. During that visit, A.C. was running a low-grade fever. Ms. Joseph concluded her affidavit by stating, "I can remember the dates, because Heather Caron apparently maintained a date book with dates that she and I would have seen each other and recently shared that date book with me." Affidavit of Theresa Joseph.[17]

iii. Affidavit of Irvin Joseph

On November 16, 2015, petitioner filed the affidavit of Irvin Joseph. Mr. Joseph stated that he was with A.C. on November 17 and 18, 2012 and recalled him walking with a slightly abnormal gait. He also said that he heard A.C. complain of pain in his feet. Mr. Joseph also recalled that A.C. was extremely fatigued and took frequent naps. Mr. Joseph saw A.C. again between December 26 and 29, 2012 and recalled that he had a low grade fever. Mr. Joseph stated that he remembered the dates "because Heather Caron apparently maintained a date book with the dates she and I would have seen each other and recently shared that date book with me." Affidavit of Irvin Joseph.[18]

iv. Affidavit of Jeremy Gordon

On December 8, 2015, petitioner filed the affidavit of Jeremy Gordon. Mr. Gordon recalled having observed A.C. on "multiple occasions." On September 22 and 23, 2012, A.C. spent the night with Mr. Gordon. Mr. Gordon said that he could "distinctly recall A.C. complaining about pain in his foot for much of the night." Mr. Gordon remembered the dates "because Heather Caron apparently maintained a date book with dates that this overnight would have occurred and recently shared that date book with me." Affidavit of Jeremy Gordon.[19]

---

[17] Ms. Joseph's affidavit can be found at ECF No. 12.

[18] Mr. Joseph's affidavit can be found at ECF No. 12.

[19] Mr. Gordon's affidavit is located at ECF No. 15.

v.  Affidavit of Jennifer Rowe

On December 8, 2015, petitioner filed the affidavit of Jennifer Rowe, who also recalled personally observing A.C. on "multiple occasions." Like Mr. Gordon, she recalled A.C. "complaining about pain in his foot for much of the night" when he stayed with her on September 22 and 23, 2012. Ms. Rowe remembered the date "because Heather Caron apparently maintained a date book with dates that this overnight would have occurred and recently shared that date book with me." Affidavit of Jennifer Rowe.[20]

Petitioner did not file affidavits from Ms. Love-O'Neill or Mr. Caron. Of the affidavits submitted, none was based on an independent recollection of the events. Everyone relied upon the date book that had been provided to them by Ms. Caron.

**C.  Testimony at Hearing**

Ms. Caron testified that A.C. received the MMR, varicella, DTaP and HIB vaccines on August 2, 2012. Tr. 7.13 to 7.21. Initially she did not notice anything out of the ordinary following the vaccinations. Tr. 7.25 to 9.2. However, in the following weeks or months, "[h]e was having an abnormal gait, you know, limping a little, complaining about a boo-boo on his foot. Nothing that was really too alarming." Tr. 8.3 to 8.9. She further testified that A.C. was "saying he had a boo-boo, he was tired, he didn't want to walk, he wanted to be carried." Tr. 8.21 to 8.24.

Ms. Caron later stated that A.C.'s foot-related pain and fatigue started in August 2012, Tr. 8.25 to 9.6, explaining that he experienced symptoms on and off until January, when "things started to get severe." Tr. 28.18 to 29.4.

When Ms. Caron was questioned about the 2012 date book and whether notations about A.C.'s complaints were written contemporaneously with the events or added later, Ms. Caron responded: "I went back later and put those in." Tr. 10.2 to 10.5, Pet. Ex. 13.[21] In response to being asked when she went back and added the notations to her date book, she responded, "[i]t was when he first started seeing Dr. Holly Brown, and so that was in 2014, I believe." Tr. 10.6 to 10.9. Ms. Caron described Dr. Brown as "a licensed acupuncturist and oriental medical doctor." Tr. at 10.11 to 10.12. No records from Dr. Brown have been filed in this matter.

When asked how she could remember the exact dates of A.C.'s complaints some two years after the fact in order to record them in the date book, Ms. Caron stated that she could recall based on the events for a particular date. Tr. 10.24 to 12.8. For example, there was a dress party at Patty Bailey's house on August 18 or 19, and she could remember A.C. being "just quiet, he didn't want to play, he just kept to himself for most of the day and he wanted me to continue to pick him up a lot." Tr. 11.25 to 12.2. "He didn't make any verbal complaints, he was just favoring his foot…he was walking lightly, he wouldn't run, he wasn't jumping." Tr. 12.3 to 12.7. Ms. Caron stated that "it would come and go. I mean, it took a few days, but we

---

[20] Ms. Rowe's affidavit is found at ECF No. 15.

[21] The date book for 2013 was filed as Pet. Ex. 14.

just figured, you know, maybe he was playing hard, it could be growing pains, you never really know." Tr. 12.13 to 12.16. Ms. Caron noted that she could only go back to the calendar to add A.C's complaints if there was a specific event; otherwise she could not have remembered when he complained. Tr. 27.3 to 27.20. Ms. Caron testified that she went back to the calendar and added the notations prior to seeking counsel. Tr. 27.21 to 28.1.

Ms. Caron testified that a month and half later, she and her husband went away for a night and left A.C. with Jennifer Rowe and Jeremy Gordon. They both submitted affidavits in this matter. Ms. Caron noted that Ms. Rowe and Mr. Gordon "were quite upset with us, because they thought we should be taking A.C. to the doctor, but I kept explaining to her that it would just resolve, you know, it wasn't something that, you know, by the time we get to the doctor, he's not complaining anymore." Tr. 13.2 to 14.5. Though the date book refers only to a fishing trip, with no notation regarding Ms. Rowe and Mr. Gordon, Ms. Caron stated that she knows she left her children with Ms. Rowe and Mr. Gordon because they are "pretty much our go-to for watching them overnight." Tr. 15.1 to 16.3.

Ms. Caron stated that she is a more active parent when it comes to medical attention, but her husband insisted that it was growing pains and A.C. did not need to be taken to the doctor. "So, I had to listen." Tr. 14.17 to 14.21.

In October, Ms. Caron recalled being at Ms. Love-O'Neill's house and A.C being "very tired…he wanted to see the horses, but he didn't want to walk, so I just carried him down…he just complained that his foot hurt a little bit." In response to why they did not seek medical attention at that point, Ms. Caron responded that "[i]t wasn't severe enough." Tr. 16.5 to 17.10.

Ms. Caron testified that she had a visit from her in-laws in November of 2012. She said that A.C. was fatigued and had complained about boo-boos on his feet. Tr. 17.11 to 18.15. According to Ms. Caron, A.C. was napping more, but she still thought it was just his growing. Tr. 18.25 to 19.10.

According to Ms. Caron, when she took A.C. to the doctor in December of 2012 for his ear, she mentioned his foot pain. Foot pain is not mentioned in the record. Petitioner testified that "the doctor agreed that they thought it was just growing pains and if it was something, you know, that continued to be persistent, just bring him back, but the appointment itself was for his ear, because he has a history of chronic ear infections." Tr. 19.11 to 20.3

Ms. Caron testified that around Christmas time, in December of 2012, A.C.'s "foot pain was more severe. He was having low grade fevers, and he didn't even want to go out in the snow to play." Tr. 20.21 to 21.5. In January, 2013, it was every day, "he was crying and he, you know, would drag himself to the restroom." Tr. 21.10 to 21.14.

In response to that testimony, I asked Ms. Caron about a visit to the emergency room at Med Coast Hospital on January 9, 2013 for complaints of a high fever. I noted that the record reflected that a joint and neurological examination was conducted and noted to be normal. I asked if she mentioned to the doctor that A.C. had been having foot pain and fatigue, to which she responded that she did, but guessed they did not document it. Tr. 29.5 to 29.14.

14

Ms. Caron testified that she took A.C. to the doctor on January 16, 2013 for complaints about his foot that was now happening every day and that he was favoring his ankle more. However, she could not remember whether she told the doctor that it had been happening intermittently during the fall. "I'm pretty sure I was like it was intermittent, and we had discussed it, but it wasn't documented. And I could have told her that I brought it up to the other doctor and she's like, oh, well, let's try this…" Tr. 21.18 to 22.13. When questioned about the doctors' note saying the symptoms started six days before, she stated that she told them six days before when he was crying, not bearing weight, and "dragging himself around." Tr. 22.21 to 23.6.

I then asked Ms. Caron about the February 8, 2013, doctor's visit for a five-day history of fever and cough and whether she mentioned to the pediatrician A.C.'s complaints of intermittent foot pain over the last several months. She responded, "I mentioned that he was complaining about his foot and that my husband thought it was just growing pains…they told me – you know, it probably is, it doesn't seem like something we should be concerned about. They palpated his foot. And, you know, just told me to return if things got worse." Tr. 29.15 to 30.6. There is no documentation of this in the record.

I asked Ms. Caron about A.C.'s doctor's visit on March 1, 2013, for stomach pain and whether she mentioned at that time that A.C. had foot pain. Ms. Caron responded, "I asked her if it could all be connected, if they were all one thing, and she said probably not, he was probably just having some gas pain and, you know, wasn't concerned at all, just poo-pooed the whole foot thing." Tr. 30.7 to 30.17. This conversation was also not documented in the record.

Ms. Caron testified that between January and March, "[T]here's periods of it being bad and then resolving a little bit, but it was never fully gone. Like beforehand, he would complain a bit, but then it would seem to go away, and now it wasn't going away at all. Some days were worse than others." Tr. 23.7 to 23.20.

In response to counsel's questions regarding the March 19, 2013 doctor's visit in which it is noted that A.C. had a two-week history of foot pain and walking funny, Ms. Caron explained that "you know—I'm always like, oh, well, it's a couple of weeks because, you know, time, when you're upset and your children are sick, it just kind of goes by…" Tr. 23.21 to 24.6.

When asked why on April 2, 2013, she reported to the doctor that A.C.'s symptoms were gradual over the last month, she explained "I mean it started a few months, that's always what I say, a few months back and that it just seemed to come and go, and then things got pretty consistent and constant with complaining, and then by this point, A.C. wasn't moving. He wouldn't move his body. He wouldn't move his neck." Tr. 24.24 to 25.12.

Ms. Caron acknowledged that all of the medical records state that A.C.'s symptoms started in January. However, she said that January was "pretty much when we first started to seek treatment, because I was like, I don't know, you know, again, I was tired and upset and up for months with my sick kid. And he's like, well when did you first start seeking treatment, then and I was like January." Tr. 25.20 to 26.14. The records say January because "that's when it all

15

became consistent and chronic." Tr. 26.18 to 26.19. She suspected that maybe he had a fracture in the summer and fall of 2012 from playing too hard. Tr. 26.23 to 27.2; 24.12 to 24.23. Respondent offered no cross-examination.

### IV. Discussion and Findings of Fact

As a preliminary matter, it is noted that in petitioner's brief regarding onset, as well as the affidavits submitted, the onset of A.C.'s symptoms was claimed to have occurred in the fall of 2012. Pet. Onset Brief. At Hearing, Ms. Caron stated that she did not notice anything out of the ordinary following A.C.'s vaccinations on August 2, 2012 (Tr. 7.25 to 9.2), but that the following weeks or months "[h]e was having an abnormal gait, you know, limping a little, complaining about a bob-boo on his foot. Nothing that was really too alarming." Tr. 8.3 to 8.9. He was "saying he had a boo-boo, he was tired, he didn't want to walk, he wanted to be carried." Tr. 8.21 to 8.24. Shortly thereafter, Ms. Caron stated that A.C.'s foot-related pain and fatigue started in August, Tr. 8.25 to 9.6, and that it was on and off until January when "things started to get severe." Tr. 28.18 to 29.4.

The medical histories petitioner provided during A.C.'s medical visits, however, consistently reflect that A.C.'s symptoms started in January of 2013—not before. Thus, on December 4, 2012, when A.C. was examined by the pediatrician for right ear "closing" past few days, there were no other complaints noted in the record of any other concerns, particularly foot pain. Pet. Ex. 2 at 145-146.

Similarly, on January 16, 2013, when A.C. presented to the pediatrician with foot pain, Ms. Caron stated that it had been ongoing since "last Thursday, about a week now." Pet. Ex. 2, p. 172.

On January 19, 2013, when A.C. presented to Mid-Coast Hospital with "20 hours of fever up to 105 has complained of nausea but no vomiting. He was noted to be alert, happy, smiling, interactive and playful, consolable, well hydrated, patient appears to be pain free." An examination was normal, and Ms. Caron did not mention that A.C. was experiencing foot pain or fatigue. Pet. Ex. 7, p. 292 to 294.

Likewise, when A.C. was examined by the pediatrician on February 8, 2013 with a five-day history of cough, congestion, runny nose, and fever to 103, he was noted to be a "well appearing child, appropriate for age, no acute distress." Pet. Ex. 2, p. 147-148. There was no mention of any foot pain, limping, or fatigue.

Further, on March 1, 2013 when A.C. was presented to the pediatrician, Ms. Caron "reports A.C. c/o belly pain for over an hour, had episode increased pain, crying, around 4 pm; so made appt now improved, acting like self. Well appearing child, appropriate for age, no acute distress active in hall and in room, appears comfortable, interactive with exam…no tenderness with exam…abdominal pain seems to be resolved now, active and playful in the room and mom states acting normal sel exam WNL." Pet. Ex. 2, p. 149-150. Again there is no mention of foot pain, limping, or fatigue.

On March 11, 2013, when A.C. was examined by his pediatrician, Ms. Caron noted that A.C. had "6 days of R foot pain. Now with some R knee discomfort." Pet. Ex. 2, p. 173 to 174.

Moreover, when A.C.'s condition became severe and his pediatrician referred him to a rheumatologist who examined him on April 2, 2013, the history petitioner provided was that "[h]e was well until January when he started complaining about pain in the right foot and ankle. The symptoms persisted into February. Again, there was ongoing pain associated with limping. His level of activity has diminished considerably. He walks with a limp and is unable to run. In recent weeks he has had sporadic low grade temperatures of around 100. In the past month he has been complaining of neck pain. This has been a consistent problem since then. He complains of occasional right knee and right hand pain." Pet. Ex. 4, p. 233.

On April 3, 2013, when A.C. was presented to Mid-Coast Hospital, Ms. Caron advised hospital personnel that "he has been having fevers daily for the last 2 weeks up to 101. Per mother, patient has been having generalized pain for the last month with a ? diagnosis of RA. TIME COURSE: gradual onset of symptoms, Date and time of onset was for a while especially over the last month, Symptoms are worsening, last few days but worse tonight around 6 pm." Pet. Ex. 7, p. 296.

Finally, when A.C. was hospitalized at Barbara Bush Hospital on April 4, 2013 for headache, polyarthralgia, fever, and weight loss, the history consistently provided by Ms. Caron to the various specialists who consulted on A.C.'s case was that of a three-year-old without a significant past medical history who began limping on his right foot in January, with symptoms that resolved within a week and then recurred in March with bilateral foot pain and left knee pain that progressed in the last five weeks. Pet. Ex. 12 at 398-399; 409, and 414.

The medical records show that Ms. Caron showed no hesitation in seeking medical intervention for A.C. when he was ill, hurt or even had large bug bites. Ms. Caron is a vigilant mother who routinely took A.C. to the pediatrician for any and all health related issues. To that end, the medical records document that A.C. began having pain in his foot in January and that Ms. Caron took him to the pediatrician with that complaint. As Ms. Caron described, A.C.'s pain did subside until March when he again complained of foot pain which was then worse and thus began his rapid decline.

In this case, as in *Cucuras,* it strains reason to conclude that petitioner would fail to accurately report the onset of A.C.'s symptoms to his physicians. It is equally unlikely that all of the various doctors that saw A.C., who are presumably trained in taking medical histories, would fail to document or would inaccurately document the mother's complaints of onset of his condition.

Petitioner has not put forward evidence sufficient to refute the contemporaneous medical records, which firmly support the onset of CRMO in January 2013.

## V. Conclusion

I have carefully and meticulously reviewed the record. Consistent with the foregoing, I find that A.C.'s symptoms of CRMO began in January of 2013, five months after his vaccinations of August 2, 2012. At this stage in the case, there has not yet been an expert medical opinion provided that describes the timing or onset of CRMO symptoms.

Petitioner is **ordered** to provide a copy of this fact ruling to each of her expert witnesses. Petitioner's expert(s) **must rely on the facts as I have found them in this Ruling.** In crafting their expert report, no expert may rely on Ms. Caron's testimony, affidavit, or the affidavits submitted by the various individuals who relied solely on Ms. Caron's date book for their recollections of events.

The following is therefore ORDERED:

**By no later than Tuesday, March 14, 2017, petitioner must file either an expert report that is based on the facts as I have found them herein, or a status report indicating how she intends to proceed.** If petitioner is unable to secure reports from her expert(s) based on the timing of onset as I have found it, she must file either a motion to dismiss, a joint stipulation for dismissal, or a motion for a ruling on the record, all of which will result in the dismissal of her claim.

**IT IS SO ORDERED.**

                                                  **s/Mindy Michaels Roth**
                                                  Mindy Michaels Roth
                                                  Special Master